TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---------------------------------------------

|  |  |  |
|---|---|---|
| | : | |
| OPINION | : | No. 88-308 |
| | : | |
| OF | : | <u>DECEMBER 7, 1988</u> |
| | : | |
| JOHN K. VAN DE KAMP | : | |
| Attorney General | : | |
| | : | |
| RONALD M. WEISKOPF | : | |
| Deputy Attorney General | : | |
| | : | |

----------------------------------------------------------------

THE HONORABLE MARIAN BERGESON, MEMBER OF THE CALIFORNIA SENATE, has requested an opinion on the following questions:

1. Are school facilities financed pursuant to the Leroy F. Greene State School Building Lease-Purchase Law of 1976 (Ed. Code, § 17700 et seq.) exempt from compliance with section 53097 of the Government Code?

2. If school facilities financed pursuant to the Leroy F. Greene State School Building Lease-Purchase Law of 1976 are not exempt from compliance with section 53097 of the Government Code, is the cost of that compliance to be included in calculating the total cost of a project for the purpose of apportioning funds to finance it under the Law?

CONCLUSIONS

1. School facilities financed under the Leroy F. Greene State School Building Lease-Purchase Law of 1976 are not exempt from compliance with section 53097 of the Government Code, i.e., construction of such facilities is subject to city or county ordinances regulating drainage or road improvements and conditions, and to city or county ordinances requiring the review and approval of grading plans as such relate to the design and construction of onsite facilities and improvements. In addition, when such facilities are constructed, consideration must be given to specific requirements and conditions of city or county ordinances relating to the design and construction of offsite improvements.

2. The cost of compliance with the ordinances mentioned in section 53097 of the Government Code is properly included in determining the total cost of a project when calculating the apportionment of funds to finance it under the Leroy F. Greene State School Building Lease-Purchase Law of 1976.

ANALYSIS

As a general rule neither the state nor its agencies is subject to local building or zoning regulations unless the Legislature has consented to such regulation. This Opinion answers whether the construction of school facilities under the Leroy F. Greene State School Building Lease-Purchase Law of 1976 is subject to certain local ordinances that Government Code section 53097 says governing boards of school districts must comply with.

Examining the essentials of the Lease-Purchase Law and the Government Code section, we will conclude that the construction under the Law is subject to those ordinances. But first, by way of background, we explain the setting of the Law and the section and how their juxtaposition gives rise to the instant request.

A. The Lease-Purchase Law. "The usual method of funding new school construction in California has been for school districts to obtain voter approval for the issuance of general obligation bonds. (See Ed. Code, §§ 15100, 15124.)" (62 Ops.Cal.Atty.Gen. 209, 210.) The Leroy F. Green State School Building Lease-Purchase Law of 1976 (Stats. 1976, ch. 1010, § 2, p. 2850; Ed. Code, tit. 1, div. 1, pt. 10, ch. 22, § 17700 et seq.) provides an alternative way in which local school districts are able to obtain needed school facilities.[1] Basically its mechanism sees the "construction" of such facilities with state money, their ownership by the state, and their lease to local school districts.[2]

One of the reasons why such leasing arrangements have proven "an effective alternate to general obligation bonds" (48 Ops.Cal.Atty.Gen. 110, 113 fn. 3 quoting Report, Assem. Int. Comm. on Municipal and County Government, 1 Assem. Jour. (1963)), is that without their method of financing, many projects would never be realized because of the constitutional proscription against school districts incurring an excess annual indebtedness over revenue without an appropriate

---

[1]Except as context may otherwise indicate, unidentified section references in this opinion will refer to those sections of the Education Code that comprise the Leroy F. Greene State School Building Lease-Purchase Laws of 1976.

[2]In this opinion, as in the Leroy F. Greene State School Building Lease-Purchase Law, the term "construction" also includes the reconstruction, remodeling, and replacement of facilities. (§ 17702.1; cf., Ed. Code, § 39142.)

vote of their electors. (Cal. Const, art. XVI, § 18[3]; see 56 Ops.Cal.Atty.Gen. 571, 575-577 (1973); 48 Ops.Cal.Atty.Gen. 110, supra.) There are also statutory limitations on the amount of immediate bonded indebtedness a school district can incur. (See e.g., Ed. Code, §§ 15102-15109.) However, with a bona fide "lease purchase" arrangement that "is entered into in good faith and creates no immediate indebtedness for the aggregate installments . . . but . . . confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished in that year, no violence is done to the constitutional provision. [Citations.]" (City of Los Angeles v. Offner (1942) 19 Cal.2d 483, 486 [option to purchase at the end of the lease]; accord, Dean v. Kuchel (1950) 35 Cal.2d 444, 447-448 [vesting of title at the end of the lease].) This is because the obligation incurred by the district is not classified as a liability "exceeding in any year the income and revenue provided for such year." (See Dean v. Kuchel, supra; City of Los Angeles v. Offner, supra; 56 Ops.Cal.Atty.Gen. 572, 575-577, supra; 48 Ops.Cal.Atty.Gen. 110, 110-113, supra.) Accordingly, a succession of cases and Opinions of this Office have upheld the propriety of such lease-purchase arrangements. (See authorities collected at 56 Ops.Cal.Atty.Gen. 572, 577, supra.)

In the specifics of Leroy F. Greene State School Building Lease-Purchase Law financing, "[e]ach school district which desires to lease a [facility from the state] for a grade level maintained by it, . . . submit[s] through its governing board an application therefor [to the State Allocation Board]." (§ 11717; cf., § 11720.) On receiving an application to enter in to such a leasing arrangement, the State Allocation Board is authorized to undertake construction of the facility for the applicant district (§§ 17702(d), 17705(d), 17710, 17712) with funds from the State School Building Lease-Purchase Fund (§ 17708; cf., § 17711). "The Board may construct any project, and may acquire all property necessary therefor, on such terms and conditions as it may deem advisable" (§ 17710) and it "has full charge of the acquisition, construction, completion, and control of all projects authorized by them." (§ 17712.)

---

[3]Section 18 of article XVI of the California Constitution currently provides:

"No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenues provided for such year, without the assent of two-thirds of the qualified electors thereof . . ., except that with respect to any such public entity which is authorized to incur indebtedness for public school purposes, any proposition for the incurrence of indebtedness in the form of general obligation bonds for the purpose of repairing, reconstructing or replacing public school buildings determined . . . to be structurally unsafe for school use, shall be adopted upon the approval of a majority of the qualified electors of the public entity voting on the proposition at such election. . . ."

The purpose for the provision was to prevent the "snowballing" of accumulated debt carried into succeeding years. (McBean v. City of Fresno (1896) 112 Cal. 159, 164; 48 Ops.Cal.Atty.Gen. 110, 110, supra.)

Upon completion of a project, the Board leases it to the district for a period of up to forty years (§§ 17705(e), 17730.2). During the term of the lease, title to all property acquired, constructed, or improved by the board remains with the state (§§ 17713, 17730) after which it "reverts" to the particular school district for which the project was undertaken (§ 17730.2). (See generally, 68 Ops.Cal.Atty.Gen. 329 (1985).)

B. Government Code Section 53097. As mentioned at the very outset, it is accepted as a general matter that neither the state nor its agencies is subject to local building or zoning regulations unless the Legislature consents to such regulation. (Cf. Hall v. City of Taft (1956) 47 Cal.2d 177, 183; City of Orange v. Valenti (1974) 37 Cal.App.3d 240, 244; Town of Atherton v. Superior Court (1958) 159 Cal.App.2d 417, 427; 68 Ops.Cal.Atty.Gen. 114, 118, 119 (1985); 56 Ops.Cal.Atty.Gen. 210, 211-212 (1973).) In a specially enacted article of the Government Code -- viz, article 5 (§§ 53090-53097) of chapter 1 of part 1 to title 5 in division 2; Stats. 1959, ch. 2110, p. 4907, § 1 [hereinafter, "article 5"] -- the Legislature has consented to a limited form of such regulation. (City of Orange v. Valenti, supra, 37 Cal.App.3d at 245.) It has provided that local agencies of the state for the local performance of governmental or proprietary functions within limited boundaries, "shall comply with all applicable building ordinances and zoning ordinances of the county or city in which the territory of the local agency is situated." (Gov. Code, § 53091; cf. id., § 53090, subd. (a).)

School districts are such local agencies; they are agencies of the state for the local operation of the State school system. (City of Santa Clara v. Santa Clara Unified Sch. Dist. (1971) 22 Cal.App.3d 153, 158 & 158 fn. 3; Town of Atherton v. Superior Court, supra, 159 Cal.App.2d at 421; Hall v. City of Taft, supra, 47 Cal.2d at 181.) But the Legislature has traditionally treated them differently from other local agencies with respect to certain aspects of the operation of article 5, in part "because it was well aware that school construction was [already] subject to almost complete control by the state." (City of Santa Clara v. Santa Clara Unified Sch. Dist., supra.) Thus for example, while all local agencies are required to comply with city or county zoning ordinances (Gov. Code, § 53091, supra), under section 53094, the governing board of a school district could previously, by two-thirds vote, exempt itself from the purview of all such ordinances and render them inapplicable to a proposed use of property by the district, unless the use was for nonclassroom facilities. (Gov. Code, § 53094; cf., City of Santa Clara v. Santa Clara Unified Sch. Dist., supra at 158; see also id., § 53091 [school district need not comply with local building ordinances when acting under the State Contract Act, nor with local zoning ordinances unless they make provision for the location of public schools and unless the city or county planning commission has adopted a master plan].)

In 1984 however, the Legislature amended section 53094 and added a section 53097 to article 5, to specifically require that school districts comply with city or county ordinances regulating drainage, road improvement, and the approval of grading plans relating to the design and construction of onsite facilities. (Stats. 1984, ch. 657, §§ 1, 2, p. 2420.) With that amendment and addition, the Legislature removed a school district's option to exempt itself from the types of

ordinances specified in newly enacted section 53097.  That section, the subject of this opinion, provides as follows:

> ". . . the governing board of a school district shall comply with any city or county ordinance (1) regulating drainage improvements and conditions, (2) regulating road improvements and conditions, or (3) requiring the review and approval of grading plans as such ordinance provisions relate to the design and construction of onsite facilities and improvements." (Gov. Code, § 53097.)

The section also provides that school districts "shall give consideration to the specific requirements and conditions of city or county ordinances relating to the design and construction of offsite improvements."  (Ibid.)[4]  The use of the word "shall" indicates that a mandatory obligation is imposed upon a district.  (Gov. Code, § 14.)

The scope of "projects" involving school facilities financed under the Leroy F. Greene State School Building Lease-Purchase Law of 1976 is likely to involve the types of local ordinances with which the Legislature has specified in section 53097.  The term "project" is defined in the Lease-Purchase Law to mean:

> ". . . the facility being constructed or acquired by the state for rental to the applicant school district and may include the reconstruction or modernization of existing buildings, construction of new buildings, the grading and development of sites, acquisition of sites therefor and any easements or rights-of-way pertinent

---

[4]Section 53097 provides in full as follows:

"Notwithstanding any other provisions of this article [e.g., § 53094], the governing board of a school district shall comply with any city or county ordinance (1) regulating drainage improvements and conditions, (2) regulating road improvements and conditions, or (3) requiring the review and approval of grading plans as such ordinance provisions relate to the design and construction of onsite facilities and improvements, and shall give consideration to the specific requirements and conditions of city or county ordinances relating to the design and construction of offsite improvements.  If a school district elects not to comply with the requirements of city or country ordinances relating to the design and construction of offsite improvements, the city or county shall not be liable for any injuries or for any damage to property caused by the failure of the school district to comply with those ordinances.

"This section shall remain in effect only until January 1, 1991, and as of such date is repealed, unless a later enacted statute, which is chaptered before January 1, 1991, deletes or extends such date."

thereto or necessary for its full use including the development of streets and utilities."  (§ 17702, subd (d).)

However, because of the particular state involvement when school facilities are constructed under the Lease-Purchase Law, question arises whether section 53097 applies to the construction of such facilities.  We are specifically asked whether that construction is exempt from the mandate of the section, i.e., whether it must comply with city and county ordinances relating to drainage and road improvements and conditions, or which require review and approval of grading plans for the design and construction of onsite facilities and improvements.  We will conclude that such construction is not exempt from section 53097's mandate and must comply with the local ordinances mentioned therein.  That being the case, we were also asked whether the cost of complying with those ordinances may properly be included in calculating the total cost of a project, as defined in subdivisions (b), (d), and (f) of section 17702, for the purpose of apportioning funds to finance it under the Lease-Purchase Law.  We will conclude that the cost of compliance is properly included in that calculation.

1. Does The Mandate of Section 53097 Apply To School Facilities Financed Under The Leroy F. Greene State School Building Lease-Purchase Law of 1976?

As mentioned, section 53097 is a recent addition to article 5.  (Stats. 1984, ch. 657, § 2.)  In enacting it the Legislature made it clear that although school districts might generally exempt themselves from local zoning ordinances under section 53094, it wanted them nevertheless to comply with certain types of local ordinances mentioned in section 53097.  (See e.g., Legis. Counsel's Dig., Sen. Bill No. 1681, 4 Stats. 1984 (Reg. Sess.) Summary Dig., p. 224.)  Under the new section, a school district would now have to comply with city or county ordinances regulating drainage and road improvements, and the approval of grading plans relating to the design and construction of onsite facilities.  Such ordinances are likely to be involved in the construction of school facilities financed under the Leroy F. Green State School Building Lease-Purchase Law, just as they would be in the case of the construction of school facilities that is otherwise financed.

In applying section 53097 to Lease-Purchase Law projects, we must determine whether the Legislature intended such application.  (Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 256; Great Lakes Properties, Inc. v. City of El Segundo (1977) 19 Cal.3d 152, 163; Select Base Materials v. Board of Equal. (1959) 51 Cal.2d 640, 645.)  There, as we have seen, question arises as to whether the Legislature intended to subject the construction of school facilities financed under the Leroy F. Green State School Building Lease-Purchase Law to the mandate of section 53097 and the local ordinances of which it speaks.  That is because the section is specifically directed to an  undertaking of "the governing board of a school district," whereas when a project is financed under the Lease-Purchase Law, a state agency, the State Allocations Board "has full charge of the acquisition, construction, completion and control" of the project (§ 17712), title to the property is in the state (§ 17713) and the school district acts as "agent of the state" on the project (§ 17729).  Accordingly, it has been suggested that these factors combine to make school construction projects under the Lease-Purchase Law projects of the state rather than those of the

governing boards of local school districts, thus rendering Government Code section 53097 inapplicable to them.

As we now proceed to explain, we do not believe that the particular nature of the state's involvement in the construction of school facilities under the Leroy F. Green State School Building Lease-Purchase Law is such as to warrant a conclusion that the Legislature either intended to exempt such construction from the requirements of section 53097 or, more generally, to clothe the overall undertaking with the State's immunity from the type of local regulation found in the ordinances spoken of therein.

It is true that when school facilities are constructed under the Leroy F. Green State School Building Lease-Purchase Law, the State is involved in its sovereign capacity, acting through a state agency, the State Allocation Board. (§ 17704.) The process involves the Department of Education and the Department of General Services as well (§§ 17723, 17724, 17725) and interestingly, the role of those Departments in the construction of school facilities under the Lease-Purchase Law is the same as they play in the construction of school facilities that are financed otherwise. (§ 17723.)[5] For example, in both situations, the Department of Education advises the governing boards of school districts on the acquisition of school sites, establishes standards for school buildings, and reviews and approves all plans and specifications for buildings (Ed. Code, § 39101; cf., id., § 39158) and the Department of General Services supervises the design and construction of school buildings and ensures that they are constructed according to approved plans (id., §§ 39140, 39143, 39144). (See generally, 56 Cal.Jur.3d, Schools, §§ 266-273.) The state is thus directly involved with the construction of school facilities financed outside of the Leroy F. Green State School Building Lease-Purchase Law but no suggestion is made that such construction is not subject to section 53097 because of that state involvement.

The predicate for state immunity from local regulation is founded, inter alia, on the notion that the state should be able to carry out its sovereign operations free of local interference unless it has otherwise consented. (See e.g., Hall v. City of Taft, supra, 47 Cal.2d 177, 184; 68 Ops.Cal.Atty.Gen. 114, 118-119, supra; 56 Ops.Cal.Atty.Gen. 210, 211-212, supra.) With the enactment of article 5 in 1959 the Legislature consented to a limited form of local regulation over local agencies which perform state functions (City of Orange v. Valenti, supra, 37 Cal.App.3d 240, 245) and with the enactment of Government Code section 53097 in 1984, it specifically required that

---

[5]Section 17723 provides:

"Nothing contained in this chapter [i.e., The Leroy F. Green State School Building Lease-Purchase Law] shall be construed as changing the powers and duties of the Department of Education or the Department of General Services in respect to school sites and the construction of school buildings as contained in Chapter 1 (commencing with Section 39000) and Chapter 2 (commencing with Section 39100) of Part 23 of Division 2 of Title 2 [of the Education Code]."

school districts, which are local agencies of the state for the operation of the state school system, comply with those city or county ordinances mentioned therein. The requirement of the section is not contingent on the method of financing school construction and we do not see the real nature of the state's involvement in school construction under the Leroy F. Green State School Building Lease-Purchase Law as creating such contingency.

Every school district in this state must be under the control of a governing board, i.e., a "board of trustees or a board of education" (Ed. Code, § 35010) and when school districts act, "by statutory provision [they] act through [their governing] boards." (Gonzales v. State of California (1972) 29 Cal.App.3d 585, 590.) With the conventional construction of school facilities, the question of "where, when or how, if at all, a school district shall construct [a] school building[] is a matter within the sole competency of its governing board to determine." (People v. Oken (1958) 159 Cal.App.2d 456, 460.) The same is essentially true with the construction of a school facility under the Leroy F. Greene State School Building Lease-Purchase Law.

Under the Lease-Purchase Law, the State Allocation Board does not generate its own business; it responds instead to the needs, and acts at the behest of local school districts as expressed in applications submitted through their governing boards, for the lease of a particular facility. (§§ 17708.5, 17717, 17717.5, 17720; cf. 68 Ops.Cal.Atty.Gen. 329, 330, supra.) As with the construction of school facilities generally, when they are constructed under the Leroy F. Green State School Building Lease-Purchase Law, it is the local district acting though its governing board which decides upon a facility, chooses its site, secures appraisals, and enters into contracts for its construction. (Compare §§ 17717, 17720 and 17729 with Ed. Code, §§ 35270, 39170, 81060.) Indeed, such role is mandated by the Lease-Purchase Law, section 17729 thereof providing:

"The [State Allocation Board] shall authorize the applicant school district to act as its agent in the performance of acts specifically approved by the board and all acts required pursuant to Article 3 (commencing with Section 39140) of Chapter 1 of Part 23 of Division 3. Such authorizations shall include, but are not limited to, the selection of school sites, the securing of appraisals, the contracting for architectural services, the advertisement of construction bids and the entering into of contracts therefor and the purchase of furniture and equipment."

Under the Lease-Purchase Law then, the governing board of a school district is the instigator of a project that will be constructed. It makes the decision regarding the facility to be built and it lets the contracts for the construction, albeit as an "agent" of the state. While actual title to a facility temporarily rests in the state for the term of a lease (§§ 17713, 11730.2), the reason for that is so the lease-purchase method of financing can be used. The state cannot lease a facility to a school district under the mechanism of the Law's lease-purchase financing, if it does not own the property. And from that we see why the district is designated as the state's "agent" in constructing

a project; it is so designated because it is dealing with property title to which is temporarily in the state.[6]

Except for these features of title and agency, which are inherent in a lease-purchase arrangement to make its financing possible, Lease-Purchase Law projects are much like district financed construction, and in both cases the governing boards of the respective school districts take all of the actions necessary for the construction of their facilities. The reality then of the construction of school facilities under the Leroy F. Greene State School Building Lease-Purchase Law, is one of school districts building needed facilities but using state funds and availing themselves of the lease-purchase mechanism to do so. There is nothing in the wording of section 53097 to suggest that it was not intended to apply to that activity of governing boards of local school districts, even though they act as "agent" of the state and title to the facilities constructed rests temporarily in the state, than to their constructing school facilities with traditional bond issue financing.

Under the Lease-Purchase Law the added essence of the state's involvement in the construction of school facilities, beyond that which it has with conventionally financed construction of those facilities, is basically financial. There is no reason why the method of financing school construction should affect the legislative intention regarding the application of the local ordinances spoken of in section 53097 to that construction.

For similar reasons, the realities of Lease-Purchase Law construction undercut the justification to clothe the activity with the state's immunity from local regulation. As we have seen, one of the reasons for according an activity of the state immunity from the type of local regulation as appears in the ordinances mentioned in section 53097, is the notion that the state should be able to carry out its sovereign operations free of local interference. Inasmuch as the construction of a school facility under the Lease-Purchase Law is essentially the undertaking of a local school district and not the state, the justification to accord it immunity from local regulation is not present. Then too, to the extent that the state is involved, its involvement is not such as would see its sovereign operations impaired if construction complies with the local ordinances spoken of in section 53097. In this vein we note that the Legislature has itself provided in section 17731 that when projects are undertaken under the Lease-Purchase Law, "[an] applicant district, acting as agent for the state, shall

_____

[6]The wording of section 17730.2 is worthy to note. It provides that

"Notwithstanding any other provision to the contrary, all lease agreements shall terminate 40 years from the date of execution and title to the property covered therein shall revert to the district as though full payment had been made." (Emphasis added.)

Under the Lease-Purchase Law a school district thus has a present vested reversionary interest in the property which it leases.

comply with all laws pertaining to the construction, reconstruction, or alteration of . . . school buildings." (§ 17731; emphasis added.) The ordinances spoken of in section 53097 would be such laws, and it thus appears that the Legislature has consented to their being applied to Lease-Purchase Law projects.

An examination of the circumstances prompting the enactment of section 53097 supports the view that the Legislature intended that construction of school facilities under the Leroy F. Green State School Building Lease-Purchase Law should comply with the local ordinances mentioned in the section.

The legislative history of section 53097 indicates that it was enacted in response to a situation which saw storm water runoff from a school site cause damage to surrounding properties. The runoff allegedly occurred because of faulty design and lack of adequate grading of the site, and it was contended that the incident would not have happened had the school district complied with local ordinances relating to design and grading. (See e.g., Assembly Local Government Committee, Comments on Sen. Bill No. 1681 (June 27, 1984), at p. 2; Senate Democratic Caucus, Summary of Legislation [SB 1681] (April 10, 1984), at p. 1; Senate Republican Caucus, Digest of SB 1681 (March 28, 1984), at p. 2.) Accordingly, section 53097 was enacted to ensure that school districts would comply with such local ordinances.

In analyzing the command of section 53097 our primary task of course has been to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d 247, 256; Great Lakes Properties, Inc. v. City of El Segundo, supra, 19 Cal.3d 152, 163; Select Base Materials v. Board of Equal., supra, 51 Cal.2d 640, 645.) While that was done initially by examining the words of the statute themselves (People v. Overstreet (1986) 42 Cal.3d 891, 895; People v. Craft (1986) 41 Cal.3d 554, 560; People v. Belleci (1979) 24 Cal.3d 879, 884; People v. Knowles (1950) 35 Cal.2d 175, 182) the words must be construed with the nature and purpose of the statute in mind, and toward that end "both the legislative history of the statute and the wider historical circumstances of its enactment are legitimate and valuable aids in divining the statutory purpose." (California Mfrs. Assn. v. Public Utilities Com. (1979) 24 Cal.3d 836, 844, citing Steilberg v. Lackner (1977) 69 Cal.App.3d 780, 785 and Alford v. Pierno (1972) 27 Cal.App.3d 682, 688; see also, Sand v. Superior Court (1983) 34 Cal.3d 567, 570.)

Examining the circumstances surrounding the enactment of section 53097 we have just seen how it was designed to ensure that school districts would comply with local drainage and grading ordinances to prevent a reoccurrence of the type of damage that had occurred from water runoff from a school site when a district had not complied with such local ordinances in constructing a facility. Where, as here, a statute is intended to address and ameliorate a particular undesirable situation, that object must be considered and the words of the statute liberally construed to give it effect. (West Pico Furniture Co. v. Pacific Finance Loans (1970) 2 Cal.3d 594, 608; People v. Ventura Refining Co. (1928) 204 Cal. 286, 291; Rich v. State Board of Optometry (1965) 235 Cal.App.2d 591, 604; County of San Diego v. Milotz (1953) 119 Cal.App.2d Supp. 871, 881.)

So doing, we can see that it matters not to the runoff of rain water, whether the grading and drainage of a school site was accomplished with state or district funds. And the runoff of waters from a school site is not dependent on the niceties of title, or whether a school district acted as agent of the state in constructing it. The purpose of the statute, avoiding a recurrence of damage from water runoff from an improperly graded or drained school site, would require heed to local drainage and grading ordinances during construction in either case.

The construction of school facilities under the Leroy F. Green School Building Lease-Purchase Law is initiated by, and takes place at the direction of, the governing boards of local school districts. They are the real parties in interest in that construction. While the Legislature has treated school districts differently from other local agencies of the state with respect to their having to heed the strictures of local building and zoning ordinances, it has made it clear in section 53097 that when their governing boards act, they nonetheless have to comply with local ordinances regulating drainage or road improvements and conditions, and local ordinances requiring the review and approval of grading plans relating to the design and construction of onsite facilities and improvements. Such ordinances are likely to be involved when school facilities are constructed with Lease-Purchase Law financing.

Accordingly, we conclude that school facilities financed under the Leroy F. Greene School Building Lease-Purchase Law are not exempt from the requirement of section 53097 and complying with the types of local ordinances mentioned therein.

2. Is The Cost Of Compliance With The Types Of Ordinances Mentioned In Section 53097 To Be Included In The Total Project Costs Of A School Facility Financed Under The Leroy F. Greene State School Building Lease-Purchase Law?

In the event that we concluded that school facilities financed under the Leroy F. Greene State School Building Lease- Purchase Law had to comply with the city or county ordinances spoken of in section 53097 of the Government Code, we were asked whether the cost of compliance with such ordinances was properly included in the total cost of the project, as defined in subdivisions (b), (d) and (f) of section 17702, when apportioning funds for it. We conclude that the cost of compliance is properly included in that calculation.

Under the Lease-Purchase Law, the State Allocation Board "apportions" funds from the State School Building Lease-Purchase Fund (§ 17708) or other sources (§ 17711) to finance the cost of a project approved by it for lease to an applicant school district. Subdivision (f) of section 17702 defines "apportionment" as

". . . a reservation of funds necessary to finance the cost of any project approved by the board for lease to an applicant school district." (Emphasis added.)

For the purposes of the Law, the term "cost of project" is defined as including:

". . . the cost of all real estate property rights, and easements acquired, and the cost of developing the site and streets and utilities immediately adjacent thereto, the cost of construction, reconstruction, or remodeling of buildings, and the furnishing and equipping of them, the cost of plans, specifications, surveys, estimate of costs or such other expenses that are necessary or incidental to the financing of the project." (§ 17702, subd. (b); emphases added.)

And again, we have seen how the term "project" is defined for the purposes of the Leroy F. Greene State School Building Lease-Purchase Law as including, inter alia,

". . . the reconstruction or modernization of existing buildings, construction of new buildings, the grading and development of sites, acquisition of sites therefor and any easements or rights-of-way pertinent thereto or necessary for its full use including the development of streets and utilities." (§ 17702, subd (d); emphases added.)

The construction of facilities and the grading and developing of sites and adjacent streets is thus an integral part of a project financed under the Lease-Purchase Law (§ 17702, subd. (d)), and the cost of such is specifically included within the "cost of a project" (id., subd. (b)) for which an apportionment of funds may be made by the board to finance it (id., subd. (f)).

In answer to the first question we concluded that the construction of school facilities financed under the Leroy F. Greene State School Building Lease-Purchase Law had to comply with local ordinances regulating drainage or road improvements and conditions, and local ordinances requiring the review and approval of grading plans as such relate to the design and construction of onsite facilities and improvements. In addition, when such facilities are constructed, consideration must be given to specific requirements and conditions of city or county ordinances relating to the design and construction of offsite improvements. The cost of complying with such ordinances is thus a necessary incident to a project undertaken pursuant to the Lease-Purchase Law. Such cost would legitimately fall within "the cost of developing the site and streets . . . immediately adjacent thereto" or "the cost of construction", and as such would be part of the total "cost of the project" (§ 17702, subd. (b)) for which appropriation under the Lease-Purchase Law can be made (id., subd. (f)) to finance it (ibid.).

We therefore conclude that the cost of having a project comply with the types of ordinances mentioned in section 53097 of the Government Code is properly included in the total cost of the project financed under the Leroy F. Greene State School Building Lease-Purchase Law of 1976.

\* \* \* \* \*